UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
-------------------------------------------------------------------X
ANTHONY SHAFFER
8613 Etta Drive
Springfield, Virginia, 22152

                                                          Docket No.:

        Plaintiffs,                                        **COMPLAINT**

    -against-

MARK ZAID, ESQ.
1250 Connecticut Avenue, N.W., Suite 700
Washington, DC 20036

and

MARK S. ZAID, P.C.
1250 Connecticut Avenue, N.W., Suite 700
Washington, DC 20036

        Defendants.
-------------------------------------------------------------------X

        COMES NOW Plaintiffs, by and through counsel, and Complains of the Defendants, as follows:

## NATURE OF ACTION

        1.        This case arises out of the failure of Defendant, Mark Zaid to zealously represent his client, Plaintiff Anthony Shaffer, when he was retaliated against by the Government and the intelligence community for being a whistleblower.

        2.        Anthony Shaffer, a career intelligence officer, both in the U.S. Army, and as a civilian assigned to the Defense Intelligence Agency, came forward in 2004 with bombshell information that rocked the entire intelligence community by answering the question that had been on everyone's mind – could we have prevented the 9/11 attacks? Shaffer revealed to the 9/11 Commission that he had been a member of a secret program to identify and map the organization

of Al Qaeda, and had uncovered two of the cells that ultimately carried out the attack, including ringleader Mohamed Atta.  However, rather than using this information to prevent the attack, government officials refused to share this information with the FBI and instead shut down the program and destroyed much of the evidence.

3. Shaffer's revelations were non-partisan, as they exposed failures in both the Clinton and Bush administrations.  However, to marginalize these revelations and protect themselves by painting Shaffer as a conspiracy theorist, government officials launched a retaliatory campaign to revoke Shaffer's security clearance and terminate him from government service.  The man who was hired to stand up and protect Shaffer against these illegal acts was his attorney, Defendant Mark Zaid.

4. While Defendant Zaid has made a name for himself through his aggressive defense of whistleblowers in politically charged matters, he failed to take any steps to protect Anthony Shaffer, even after a Congressional finding that Shaffer had suffered whistleblower retaliation. Instead of heading his client's repeated pleas for help, Zaid kept Shaffer dangling on the hook for years, promising action as the statute of limitations ran out.  Thereafter, they later received an unexpected sworn confession by a former Department of Defense Assistant Inspector General saying that his office had intentionally and illegally targeted Shaffer for termination in retaliation to his whistleblower activities.  Rather than taking action to protect his client's rights, Zaid ran away and quit, citing a conflict of interest.  Although Zaid never explained the nature of the conflict to Shaffer, it appears that he was playing both sides and may have been working on behalf of the corrupt government officials who he was ethically bound to protect Shaffer from.

5. Over the past two years, the news cycle has frequently featured stories of whistleblowers being zealously defended by Defendant Zaid as part of the efforts to impeach the

President.  These stories have brought new light to a vitally important issue, as Defendant eloquently summarized in a New York Times Op-Ed:

> Whistle-blowers are needed now more than ever.  They must be persuaded that while there are always risks, the system can protect them…Whistle-blowers play a particularly critical role in Congress's ability to oversee the intelligence community.  As the executive branch controls classified information, the House and Senate Intelligence Committees are reliant on inspectors general and whistle-blowers to conduct their constitutionally mandated oversight over federal agencies and even the president of the United States.

6.  In a separate article, Zaid bragged that his job is "to ensure the rule of law was followed in how whistleblowers are treated. That role should not be negatively weaponized by partisans."  Yet, what the events of the past few years have demonstrated is that Defendant Zaid has abandoned these principles of fairness, equality, and justice in favor of partisanship.  Days after the inauguration, Zaid tweeted "#coup has started. First of many steps. #rebellion. #impeachment will follow ultimately."  A few months later, he tweeted "We will get rid of [President Trump]."

7.  When an attorney signs on to protect a client from government abuses, they should be guided by their ethical responsibilities to that client, as well as the facts and the law.  Defendants owed Anthony Shaffer the same duty of zealous representation that they gave to the impeachment whistleblowers, but they did not fulfill that duty.

## JURISDICTION AND VENUE

8.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332, because Plaintiff and Defendant are citizens of different States and the amount in controversy exceeds $75,000, exclusive of interests and costs.

9. Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District or, alternatively, 28 U.S.C. § 1391(b)(3) as Defendant Zaid and the Zaid Firm are residents of the District of Columbia.

## THE PARTIES

10. Plaintiff Anthony Shaffer is a retired Army Lieutenant Colonel and President of the London Center for Policy Research. He resides in Springfield, Virginia.

11. Defendant Mark Zaid is an attorney, duly licensed in the District of Columbia, New York, Connecticut, Maryland, and several federal courts. He works in the District of Columbia.

12. Defendant Mark S. Zaid, P.C. is a law firm that employs defendant Zaid, was incorporated in the District of Columbia on December 31, 1997, maintains an office, and conducts business in the District of Columbia.

## STATEMENT OF FACTS

### Background

13. Plaintiff enlisted in the Ohio National Guard as a senior in high school, as a telecommunications center operator. During Plaintiff's time in the National Guard, Plaintiff became the public affairs director for the local Guard unit and was inducted into the Ohio Army National Guard Recruiter Hall of Fame, and was commissioned in June 1983 as a second lieutenant in Military Intelligence.

14. While attending college at Wright State University (WSU), in Dayton, Ohio, from 1982 to 1986 Plaintiff began his career as an intelligence officer with the Army's counterintelligence and human intelligence (HUMINT) program, often assuming an alias as an undercover agent, in classified programs, tackling counterterrorism, counterdrug, and super-secret high-tech penetration of foreign nations using tradecraft and technology. In 1986 he graduated

with a Bachelor of Arts with a dual major in Political Science an Environmental Studies.   In 1987 he became an AFSC 8025 USAF Air Force Special Activities Center clandestine HUMINT operative. 1988 he was the top graduate from Central Intelligence Agency's Field Operative Training, know as Military Operations Training Course (MOTC). While at AFSAC his focus was Foreign Material Acquisition (FMA), Foreign Officer Recruitment Activity (FORA) and support to DIA's STAR WATCHER (U) program.  In 1991, Plaintiff was recalled to active duty for Operation DESERT SHIELD/DESERT STORM with the US Army's Intelligence and Security Command (INSCOM) where he supported and planned strategic HUMINT collection in support of the first Gulf War. He then joined INSCOM's Military Intelligence Civilian Excepted Career Program (MICECP) in 1991 and supported DoD joint clandestine programs, including STAR WATCHER (U) and STAR WATCHER B (U). In 1991 Plaintive became responsible to oversee the entire US Army clandestine human intelligence program, and was the operations officer for CAROLINA MORNING (U), a BLUE BORDER (U) joint Army/CIA operation.

15.   In 1995, the Defense Intelligence Agency (DIA) assumed all clandestine human intelligence collection assignments from the General Defense Intelligence Program (GDIP) which resulted in the transfer of thousands of intelligence civilian billets to DIA, including the Army clandestine human intelligence program.

16.   The DIA was an analytical organization formed in 1962 and was radically different from the Army human intelligence program. From 1995-2006, Plaintiff worked as a civilian employee of the Defense Intelligence Agency (DIA) within the Department of Defense (DOD) while simultaneously continuing to serve in the Army Reserves.

17.   From 1999-2001 Plaintiff was director of Special Mission Task Force STRATUS IVY, the first hybrid NSA/DIA cyber undercover unit that also supported the planning and conduct

of Title 10 DoD "close access" operation. One of the key missions of Task Force Stratus Ivy was to investigate penetrating al Qaeda command and control nodes in the Afghanistan region. Plaintiff's mission was known as ABLE DANGER and Plaintiff was tasked with finding a way to access the computers and pull the data without al Qaeda knowing.

18.  The ABLE DANGER program was initiated in October 1999, by General Henry H. Shelton, Commander in Chief of United States Special Operations Command (SOCOM) and was concluded in January 2001.

19.  ABLE DANGER was a Top-Secret program[1] created in response to the rise of al-Qaeda, founded in 1988 by Osama bin Laden, and the successful execution of al-Qaeda's terrorist attacks on U.S. citizens, Federal infrastructure and military assets around the world. On February 26, 1993, al-Qaeda trained terrorists bombed the World Trade Center in New York killing six and wounding 1,500. In August 1998, al-Qaeda terrorists carried out bombings against U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania killing more than 200 people and injuring more than 5,000 others. On 12 October 2000, al-Qaeda terrorists attacked the USS Cole in Aden Harbor, Yemen killing 17 U.S. Navy sailors.

20.  The goal of ABLE DANGER was to identify and exploit vulnerabilities associated with the command and control infrastructure of al-Qaeda to include its leadership and other affiliated organizations. In that regard, ABLE DANGER employed state-of-the-art analytics to engage in data mining to identify linkages and patterns for intelligence analysts and operations planners. The data was supplied by various intelligence agencies and other government databases along with open source material from the World Wide Web.

---

[1] All of the information contained in this complaint about this program are based on publicly available, declassified information.

21. Plaintiff was a member of the ABLE DANGER Program who along with others stated under oath that ABLE DANGER had identified two of three Al-Qaeda cells before they launched the attacks against the World Trade Center and Pentagon on 11 September 2001. Among the terrorists identified was a ringleader of the attack, Mohamed Atta, and other members of a Brooklyn, NY based al-Qaeda cell.

22. In September 2000, Plaintiff alerted his superiors regarding this imminently vital and pertinent information uncovered during ABLE DANGER, but military lawyers stopped any further action from taking place. Plaintiff further stated that there was a failure to share the intelligence about the terrorists with the FBI before the attacks and subsequently the data that would have proved the detection of Mohamed Atta was destroyed.

23. The Director of ABLE DANGER reported to Major General (MG) Geoffrey C. Lambert, U.S. Army, former Director, Center for Operations, Plans and Policy, United States Special Operations Command. In the book Horse Soldiers: The Extraordinary Story of a Band of US Soldiers Who Rode to Victory in Afghanistan, by Doug Stanton, issued in 2010, MG Lambert confirms the statements of LTC Anthony A. Shaffer in regard to attempts to inform the FBI.

24. Plaintiff alerted his superiors of the information obtained during ABLE DANGER, but it fell on deaf ears. Al Qaeda was able to execute their terrorist mission resulting in the September 11, 2001 attacks on the United States.

25. In 2004 Plaintiff contacted the 9/11 Commission to relay the information pertaining to ABLE DANGER identifying some of the hijackers prior to 9/11.

26. In March 2004 Plaintiff had his security clearance suspended by the DIA. On February 28, 2006. The DIA revoked Plaintiff's security clearance alleging he had engaged in criminal conduct and was not credible.

### Shaffer Retains Zaid

27. Plaintiff retained Defendant in 2005 to represent him. The representation initially included:

    a. Plaintiff's testimony before the Senate Judiciary Committee.

    b. Plaintiff's security clearance revocation and wrongful termination from the DIA.

28. Thereafter, the scope of representation expanded to include a 1st Amendment claim against the United States regarding unnecessary redactions to his book *Operation Dark Heart: Spycraft and Special Ops on the Frontlines of Afghanistan*.

### Zaid and the 1st Amendment Case

29. In 2007, Plaintiff penned his memoir titled *Operation Dark Heart: Spycraft and Special Ops on the Frontlines of Afghanistan (Dark Heart)*

30. Per the non-disclosure agreements Plaintiff signed throughout his career in the Army Reserves, Plaintiff submitted the manuscript for *Dark Heart* to the Army Reserves for prepublication review. *Dark Heart* was favorably reviewed by two officers in Plaintiffs Army Reserve chain-of-command. Plaintiff submitted the manuscript to St. Martin's Press for publication in February 2010.

31. At some point before the book's scheduled distribution date, the DIA obtained a copy of the manuscript, reviewed it, and determined that it contained classified information. The CIA also reached the same conclusion.

32. On August 6, 2010, due to the CIA and DIA objections to publication, the Army Reserve revoked its publication approval. Plaintiff agreed to a revision of certain passages and

redaction of all text which the parties could not agree to modify. At the end of the process, approximately 250 of the Book's 320 pages contained redactions.

33. On December 14, 2010, Plaintiff, through Defendant, filed a Complaint against the DIA, alleging they deprived him of his 1st Amendment right to publish by improperly designating as classified a substantial amount of unclassified information in *Dark Heart*. DIA moved to dismiss for lack of standing and Judge Ricardo M. Urbina denied DIA's motion and ordered Plaintiff, through Defendant, to amend the Complaint to address the issue of standing.

34. An Amended Complaint was filed on February 13, 2012. The DIA moved to dismiss again arguing that Plaintiff lacked standing. The court again denied the DIA's motion to dismiss and found Plaintiff did in fact have standing.

35. On March 26, 2015, the Court ruled on DIA's second Motion for Summary Judgment. Judgment was entered in favor of Plaintiff regarding the claim of his right to publish information from his February 15, 2006 testimony before the House Armed Services Committee and further indicated Plaintiff was the prevailing party on this issue.

36. Under the Equal Access to Justice Act (EAJA) the prevailing party in a non-tort suit against the United States is entitled to fees and expenses upon application to the court. In fact, Judge explicitly ruled in her decision that ""As a prevailing party, Lt. Col. Shaffer may proceed on a claim for attorney fees under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 412" *Shaffer v. Def. Intelligence Agency*, 102 F. Supp. 3d 1, 12 n.11 (D.D.C. 2015).

37. Despite an explicit invitation from the Court and the written urgings of his client, Defendant failed to make the application to the court for Attorney's fees or pursue any damages on his client's behalf.

38. Defendant had actual knowledge of both the procedures for applying for fees, as well as the appropriate standards and billing practice, considering his involvement in *Doe v. Rumsfeld*, 501 F. Supp. 2d 186 (D.D.C. 2007). In *Doe,* Zaid filed an action challenging the legality of the Anthrax Vaccine Immunization Program. Although he prevailed on the merits, he then submitted an application for $508,310.44, which Judge Sullivan systematically dismantled, citing numerous instances of improper billing practices.

39. At all times during the representation, Zaid represented to Plaintiff that he fully understood these provisions and that he would not seek payment from Plaintiff, but rather from the Government through a fee application.

## Security Clearance and DIA Retaliation

40. After disclosing the facts of ABLE DANGER and becoming a Whistleblower, the DIA suspended Plaintiff's clearance and ultimately revoked the clearance on February 28, 2006.

41. In February 2015, Plaintiff testified before Congress regarding ABLE DANGER and multiple issues related to the 9/11 and intelligence failures.

42. While Plaintiff was acting as a Whistleblower and testifying before Congress regarding ABLE DANGER, Plaintiff was represented by Defendant who assisted him throughout the process. It was during this time Plaintiff lost his clearance and was wrongfully terminated by the DIA.

43. Plaintiff informed Defendant he wanted to sue for damages and file a complaint for the loss of his clearance and wrongful termination. While Defendant did assist Plaintiff with his security clearance revocation, Defendant failed to file a complaint with the Office of Special Counsel (OSC) regarding the retaliation Plaintiff faced from the DIA. Defendant informed Plaintiff it would be a conflict of interest to file the OSC complaint though Defendant never

informed Plaintiff how it was a conflict of interest at the time he was representing him regarding this very matter before Congress.

44. On October 10, 2006, Congressman Christopher Shays wrote to MG Elbert Perkins regarding Plaintiff and whistleblower laws. Shays asserted the DIA used the security clearance system against Plaintiff and did not follow DoD security clearance guidelines. Shays further insisted that an independent review by the Army Security system was needed to reinstate Plaintiff's Top Secret/Sensitive Compartmented Information (TS/SCI) clearance. Defendant was aware of this letter and again failed to file a complaint with the OSC regarding Plaintiff's retaliation at the hands of the DIA.

45. Due to the advice of Defendant, Plaintiff never filed Whistleblower Retaliation Claim within the Statute of Limitations.

### John Crane's Disclosure regarding retaliation against Shaffer

46. In 2017, Mr. John Crane (Crane), the former Assistant Inspector General for Communications and Congressional Liaison for the DoD, Office of the Inspector General from 2004-2013, submitted a Disclosure of Urgent Concern to the Inspector General's office regarding the DOD IG investigation entitled *Alleged Misconduct by Senior DoD Officials concerning the ABLE DANGER program and Lieutenant Colonel Anthony A Shaffer, U.S. Army Reserve (*Report H05L97905217).

47. The affidavit specifically made record of the obstruction of the Federal investigatory process in violation of 18 U.S.C. § 1505, by Henry C. Shelley Jr., Deputy General Counsel, DoD IG, and legal advisor on the ABLE DANGER investigation. The affidavit specifically stated

> The misconduct, under color of office, by Henry C. Shelley Jr.,
> included violations of the Whistleblower Protection Act of 1989,

>as amended [5 U.S.C. § 2302], to include prohibited personal actions in the form of retaliation against LTC Anthony A. Shaffer for making disclosures in the course of his official duties regarding misconduct by RMOs, political and military, under color of office, in regard to the ABLE DANGER.

48. Crane further went on to state the DoD investigation into ABLE DANGER occurred at the same time the DoD IG issued a report entitled: *Review of the Pre-Iraqi War Activities of the Office of the Under Secretary of Defense for Policy* (Report No. 7-INTEL-04) hereinafter, Feith Report. Both ABLE DANGER and Feith Report, resulted in providing legal cover to senior political and military RMOs who were subjects of DoD IG investigations. Henry J. Shelley, Jr. provided binding legal determinations on both ABLE DANGER and the Feith Report, thus precluding the independence and objectivity of the DoD IG. Rather Shelley represented the interests of senior RMOs both political and military, rather than the independent and objective interests of the DoD IG.

49. Henry C. Shelley Jr., and Donald M. Horstman as the RMOs who had obstructed the Federal investigative process and created an erroneous analysis challenging Plaintiff in the ABLE DANGER report were then the RMOs who judged the credibility of the testimony of Plaintiff and whether he had been subjected to prohibited personnel practices for his whistleblowing activities.

50. Crane stated in the affidavit that the mishandled investigation revealed failures by the DoD IG, gravely risked national security and continued a pattern of misconduct in direct violation of Federal laws and regulations. Crane alleged the DoD IG mishandling of ABLE DANGER was in direct violation of Title 18 U.S.C. Section 793 and ICD 703.

51. It was a clear conflict of interest for the RMOs making erroneous findings against Plaintiff in ABLE DANGER investigation to also become RMOs in the determination of whether prohibited personnel actions had been taken against Plaintiff.

52. Crane further stated that in the ABLE DANGER report evidence was presented that Plaintiff lied about the DIA mailing classified information to Plaintiff when returning personal property, but two attorneys witnessed Plaintiff receiving the classified material from the DIA. The ABLE DANGER report excludes sworn testimony from the attorneys supporting the account of Plaintiff and vouching for his credibility.

53. The ABLE DANGER report then found that Plaintiff, while meeting with the 9/11 Commission in October 2003, did not make specific claims in regard to the identification of Mohammed Atta. The ABLE DANGER report then concludes that Plaintiff did not make a protected disclosure under the Whistleblower Protection Act of 1989, as amended all of which are erroneous and were done in an effort to retaliate against Plaintiff.

54. As Crane stated in his affidavit

> "the security clearance of LTC Anthony A. Shaffer was revoked on 28 February 2006, but only after LTC Anthony A. Shaffer had also made disclosures to Chairman Curt Weldon, House Committee on Armed Services, and other members of Congress and their staff starting on 14 May 2005, and had made statements to the media beginning in August 2005. All of these actions were known to DIA managers and supervisors during their consideration of revoking his security clearance."

55. Crane further disclosed the ABLE DANGER report created a twisted and convoluted basis for prohibited personnel practices but used erroneous findings generated outside the normal Federal investigatory process to dismiss Plaintiff's testimony.

56. According to Crane, the misconduct of Henry C. Shelly, Jr. included "misapplication of the Whistleblower Protection Act of 1989, as amended, 5 U.S.C. § 2302, by

upholding prohibited personal actions against LTC Anthony A. Shaffer for making disclosures, in the course of his official duties, regarding misconduct by RMOs, political and military in regard to ABLE DANGER."

### Zaid Terminates the Attorney-Client Relationship

57. On September 6, 2017, Plaintiff contacted Defendant, who had represented Plaintiff in an ongoing and continuous basis, regarding the Affidavit and disclosure by Crane to discuss options of pursuing a retaliation claim.

58. Defendant immediately responded he would no longer be able to represent Plaintiff as it was a conflict of interest. At no point did Defendant explain the conflict of interest.

59. On information and belief, a conflict may have existed long before the Crane affidavit came to light, as Defendant represents several corrupt government officials. In retrospect, this may be the reason why Defendant never pursued Plaintiff's claims earlier, but the Crane affidavit brought the conflict to the surface, forcing Defendant to run away.

### After Termination

60. Soon after the representation ended, Plaintiff requested a copy of his file, through his new attorney. However, Zaid failed to cooperate or to turn over the documents necessary for replacement counsel to assist Schaffer. A few months later, Zaid's partner, Andrew Blakaj, hired Shaffer's new attorney into his firm, along with Zaid, thus extending the unidentified conflict and severing that attorney-client relationship as well.

61. Later, as the statute of limitations for legal malpractice was nearing expiration, Shaffer again demanded a copy of his file from Defendants. This time, Zaid responded by

threatening to sue Plaintiff for defamation[2] if he chose to sue Zaid, as well as for breach of contract. Ironically, the breach of contract action threatened was to recover fees from the 1st Amendment suit for which the Court directed Zaid to make an application. Despite requests by both the Court and Shaffer, Zaid failed to submit the application to the Court and cannot now sue Shaffer for his own failure.

62. Despite telling Plaintiff that he would provide the copy by September 4, 2020, Zaid failed to do so. At the time of filing, Zaid still has not fulfilled his ethical obligation to surrender the file to the client, as required under the District of Columbia Rules of Professional Conduct 1.16(d).

## FIRST COUNT

### Legal Malpractice

63. Plaintiff repeats each and every allegation of the Parties and Facts Common to All Claims, as if more fully set forth at length therein.

64. Defendants Zaid and Mark S. Zaid, P.C. were hired by Plaintiff to represent Plaintiff in a 1st Amendment case and a security clearance revocation and ultimate wrongful termination by the Defense Intelligence Agency ("DIA").

65. Defendants owed Plaintiff a duty of competent representation.

66. Defendants failed to perform his service with an ordinary standard of care when he:

    a. Failed to make the application for Attorney's fees or seek any damages on Plaintiff's behalf after prevailing in the case against the United States with

---

[2] It is unknown why Zaid would threaten a defamation suit, as Plaintiff's letter simply asked for a copy of his file and did not discuss any particulars of the potential complaint. Additionally, as an attorney, Zaid should understand that allegations in a complaint are immune from defamation claims pursuant to the litigation privilege.

        regards to Plaintiff's 1st Amendment rights, despite explicit written requests from Plaintiff;

    b. Failed to pursue the claim against the DIA for wrongful security clearance revocation, wrongful termination and Whistleblower Retaliation, despite explicit written requests from Plaintiff;

    c. Finally, when presented with information regarding the direct retaliation by the DIA, Defendant finally revealed that he had a conflict of interest that prevented him from pursuing Plaintiff's claim. On information and belief, Defendant knew about this conflict of interest beforehand but concealed it until the Crane affidavit made it impossible to continue. Thus, he failed to timely inform Plaintiff of a conflict and failed to recommend that Plaintiff seek alternative counsel to represent him in a Whistleblower Case.

67. Defendant failed to perform his services with an ordinary standard of care that would be expected of an experienced Whistleblower Attorney.

68. But for Defendants negligent acts or omissions, Plaintiff would not have suffered the loss of his career with the DIA and United States Army Reserves.

69. But for Defendants negligent acts or omissions, Plaintiff would have recovered damages, both in the 1st Amendment case, as well as his claims against DIA.

70. Plaintiff has been damaged by Defendants wrongful conduct in an amount to be determined at trial, but in no event less than the $75,000 jurisdictional threshold of this Court.

71. In addition, because Defendant's conduct was so willful, wanton and malicious, punitive damages should be awarded in an amount to be determined by a trial by jury, but in no event less than $1,000,000.

## SECOND COUNT

### Breach of Fiduciary Duty

72. Plaintiff's repeat each and every allegation of the Parties and Facts Common to All Claims, and the First Count as if more fully set forth at length therein.

73. Defendant Zaid owes a duty of loyalty to Plaintiff and, particularly, a duty not to act in any way detrimental to the case in which Defendant represented Plaintiff.

74. Defendant breached this fiduciary duty to Plaintiff by failing to file the application for Attorney's fees for the 1st Amendment case. In fact, Defendant Zaid presented a bill to Plaintiff for Attorney's fees knowing Plaintiff was entitled to Attorney's fees as the prevailing party.

75. Defendant breached his fiduciary duty to Plaintiff by failing to file the OSC Whistleblower Claim when asked to do by Plaintiff. Furthermore, Defendant breached this duty when he failed to disclose a conflict of interest which ultimately prevented Plaintiff from pursuing his claim within Statute of Limitations.

76. Plaintiff has been damaged by Defendant's wrongful conduct in an amount to be determined at a trial by jury, but in no event less than the $75,000 jurisdictional threshold of this Court.

77. In addition, because Defendant's conduct was so willful, wanton and malicious, punitive damages should be awarded in an amount to be determined by a trial by jury, but in no event less than $1,000,000.

WHEREFORE, Plaintiff demands judgement against for the following relief:

       A. Compensatory damages;

       B. Interest and costs of suit;

       C. Reasonable attorney's fees; and

D. Such other relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiff's hereby demand a trial by jury as to all issues triable.

Dated: September 6, 2020
Falls Church, Virginia

Respectfully submitted,

Timothy C. Parlatore, Esq.
Parlatore Law Group, LLP
*Attorneys for the Plaintiffs*
One World Trade Center, Suite 8500
New York, NY 10007
212-679-6312
212-202-4787 Facsimile
timothy.parlatore@parlatorelawgroup.com